# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 21, 2014 at Knoxville

## STATE OF TENNESSEE v. CALVIN ELLISON

**Appeal from the Circuit Court for Madison County**
**No. 13-292    Roy B. Morgan, Jr., Judge**

---

**No. W2013-02786-CCA-R3-CD - Filed December 10, 2014**

---

Calvin Ellison ("Defendant") was indicted on one count of attempted first degree murder, two counts of aggravated assault, and one count of employing a firearm during the commission of or attempt to commit a dangerous felony - attempted first degree murder. A jury returned verdicts convicting the Defendant of misdemeanor reckless endangerment as a lesser-included charge of attempted first degree murder, one count of aggravated assault, and employing a firearm during the commission of or attempt to commit a dangerous felony. On appeal, the Defendant challenges the trial court's ruling excluding a portion of his expert witness's testimony; argues that his conviction for employing a firearm during the commission of or attempt to commit a dangerous felony should be overturned in light of the jury's verdict in the first count of the indictment; and challenges the sufficiency of the evidence supporting his convictions. After a thorough review of the record and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment**
**of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

George Morton Googe, District Public Defender; Jeremy B. Epperson, Assistant Public Defender, Jackson, Tennessee, for the appellant, Calvin Ellison.

Robert E. Cooper, Jr., Attorney General and Reporter and Tracy L. Alcock, Assistant Attorney General; Jerry Woodall, District Attorney General and Al Earls, Assistant District Attorney General, for the appellee, State of Tennessee.

-1-

## OPINION

### Factual and Procedural Background

A Madison County Grand Jury indicted the Defendant, Calvin Ellison, for the following charges:

| Count | Charge | Victim |
|-------|--------|--------|
| 1 | Attempted First Degree Murder | Joshua Cathey |
| 2 | Aggravated Assault | Joshua Cathey |
| 3 | Aggravated Assault | Princess Cathey |
| 4 | Employing a Firearm During the Commission of or Attempt to Commit a Dangerous Felony: Attempted First Degree Murder | Joshua Cathey |

After a trial, the petit jury returned a verdict finding the Defendant guilty of the lesser-included offense of misdemeanor reckless endangerment in count one; guilty of aggravated assault in count two; not guilty of aggravated assault in count three; and guilty of employing a firearm during the commission of a felony in count four. The Defendant raises three issues on appeal: (1) whether the trial court erred in excluding a portion of the defense expert's testimony; (2) whether the conviction for employing a firearm during the commission of or attempt to commit a dangerous felony should be overturned; (3) whether there is sufficient evidence to sustain the Defendant's convictions. We affirm the judgments of the trial court.

Prior to trial, the State moved to prohibit the defense's expert witness from giving any testimony that commented on or evaluated evidence or testimony provided by another witness. At a hearing, the State argued that the defense's witness was an expert in the field of ballistics, not videography, and as such, he should be precluded from judging the credibility of witnesses by comparing his findings to a video of the incident. The Defendant argued that he did not intend to ask the expert witness if he believed other witnesses were telling the truth; he simply wanted to ask whether the other witnesses' prior statements were consistent with the expert's findings. We note, however, that the Defendant did not give an offer of proof as to what his expert witness's response would be.

The trial court held that defense's expert witness could comment on ballistic evidence. However, unless the Defendant could demonstrate that the witness had expertise in videography such that he would be providing the jury with information that they could not

otherwise get by watching the video themselves, the defense's expert witness could not give his opinion on what he saw in the video. Further, the trial court held that the defense's expert witness could not comment on the credibility of any other witness, because such comments would invade the province of the jury to weigh the witnesses' credibility.

Joshua Cathey testified that on the night of December 22, 2011, he lived one block away from the convenience store where the shooting took place. Around 7:00 or 7:30 that evening he and his wife drove to the convenience store to pick up a loaf of bread and parked on the side of the curb opposite the store. Mr. Cathey went into the store, and while inside he saw the Defendant. Mr. Cathey made his purchase and left the store, and the Defendant followed him outside. As Mr. Cathey was walking to his vehicle, the Defendant stated, "[w]hat's up with that s***?" Mr. Cathey testified that he believed the Defendant's comment was referencing a previous disagreement they had regarding the Defendant communicating with Mr. Cathey's wife. Mr. Cathey got into his vehicle, but the Defendant walked toward the car, pulled out a gun, and pointed it at Mr. Cathey. At that time, Mr. Cathey's wife, who was in the front seat, ducked down into the floorboard, and Mr. Cathey put his head down and drove away. As he was driving away, he heard "several" gunshots – some of which struck the vehicle. Mr. Cathey described the damage to his vehicle stating that the driver-side rear window had been shattered, a bullet was lodged in the driver-side rear window frame, and the front passenger-side tire was flat.

Mr. Cathey confirmed that he heard the gunshots as he was driving away. He further admitted that his wife had a cell phone with her in the vehicle when the shooting occurred, but they waited until they had returned home to call the police – "a couple of minutes after [the shooting] happened." Mr. Cathey further testified that the Defendant was three to five feet away from the driver-side window when he saw the gun.

Through Mr. Cathey, the State introduced a copy of a surveillance video from the convenience store taken on the evening in question. The video shows Mr. Cathey inside the store with the Defendant and other individuals. Additionally, the video shows footage from an outside camera, which appears to show the parking area in front of the convenience store as well as a portion of the street. Footage from this angle shows an individual, later identified by Mr. Cathey as the Defendant, come into the frame at the top of the screen. He appears to be running toward the convenience store from across the street. A car passes immediately behind him and turns away from him. The Defendant turns around and raises his arm toward the vehicle. The vehicle then exits the screen on the upper left corner, and the Defendant exits the screen to the upper right corner.

Princess Cathey testified that she accompanied her husband to the store on the night of the shooting around 7:00 or 7:30 p.m. While Mr. Cathey was in the store, Mrs. Cathey

remained in the vehicle. She observed Mr. Cathey leave the store and the Defendant follow him. She stated that the Defendant said something to Mr. Cathey, and Mr. Cathey got into the vehicle. Once Mr. Cathey was inside the vehicle, Mrs. Cathey saw the Defendant standing "about three to five feet [from the vehicle]" holding a gun. At this point, Mrs. Cathey ducked down onto the floorboard of the vehicle as Mr. Cathey drove away. She heard about five or six gunshots but admitted that she was not counting them. Mrs. Cathey said that she called law enforcement once they had returned home.

On cross-examination, Mrs. Cathey admitted that the Defendant could have been standing as close as two feet from the vehicle but maintained that "he was close" and standing on the driver-side of the vehicle. She maintained that their vehicle was parked on the side of the street opposite the store at the time the shooting occurred.

Officer Corey Insalaco with the Jackson Police Department testified that he responded to a call of a shooting around 7:30 p.m. on December 22, 2011. When he arrived at the Catheys' residence, he spoke with Mr. and Mrs. Cathey and took photographs of their vehicle. He described the damage to the vehicle's window frame and stated that he pulled a bullet from the frame. He further stated that he had been given the Defendant's name as a possible suspect, but he did not speak to him that evening.

On cross-examination, Officer Insalaco stated that Mr. Cathey told him that the Defendant "displayed a handgun and pointed it at him through the window." He further stated that Mr. Cathey did not describe the Defendant as standing three to five feet away. Officer Insalaco also stated that it was his understanding that the Defendant was standing on the driver-side of the vehicle.

Officer Kevin Speck of the Jackson Police Department testified that he also responded to reports of a shooting around 7:30 or 8:00 p.m. on December 22, 2011. He first responded to the Catheys' home and then went to the location of the shooting. At the scene, Officer Speck recovered four spent shell casings. Three were collected across the street from the convenience store and one was collected by the dumpster, closer to the convenience store. No weapon was recovered from the scene. Officer Speck agreed that passing cars possibly could have scattered the shell casings from their original location. He further stated that the shell casing near the dumpster was "a pretty good distance" from the others.

Investigator Daniel Long of the Jackson Police Department testified that he took Mr. and Mrs. Catheys' statements. He also spoke with the Defendant several days after the shooting. During that conversation, the Defendant stated that he knew the Catheys and that he had a disagreement with Mr. Cathey over Facebook. The Defendant denied being at the convenience store on the night of the shooting, claimed that he did not own a firearm, and

claimed that he had not shot at Mr. Cathey. Investigator Long attempted to get an adopted statement from the Defendant, but the Defendant refused to sign it.

Cervinia Braswell of the Tennessee Bureau of Investigation ("TBI") testified as an expert in ballistics, firearms, and ammunition identification. Braswell stated that she received one bullet and four shell casings in connection with the case. She was able to determine that the bullet could have been fired from a .45 caliber gun. She also identified the shell casings as .45 automatic cartridge cases, but she stated that without the gun it was impossible to determine whether the bullet she received matched any of the shell casings she received. However, she could determine that all the shell casings were fired from the same weapon.

David Brundage testified for the defense as an expert in the field of ballistics, trajectory analysis, and shooting scene reconstruction. Brundage said that, other than reviewing videos in connection with his cases, he had no training in videography or video enhancement. Brundage testified that he reviewed statements made by Mr. and Mrs. Cathey, photographic evidence, video surveillance, and the TBI report to form his opinion about this case. He described the surveillance video as showing an individual running across the street outside the convenience store. As the individual is running across the street, a vehicle comes across the screen immediately behind him, moving "rapidly." The individual turns and faces the vehicle, and the vehicle narrowly avoids hitting the individual. Then the individual steps out of the screen to the upper right, and the vehicle leaves the screen to the upper left. Brundage also stated that the video showed the individual raise his arm as he turned toward the vehicle, but he could not determine if the individual had anything in his hand or see any indication that shots were fired. Had shots been fired, Brundage said that he would expect to see flashes of light on the video.

Brundage also reviewed photographs of the victims' vehicle. He testified that he could clearly see damage to the vehicle's window frame, but without examining the damage himself, he could not determine whether the damage was caused by a bullet. Additionally, he concluded that it would not be plausible for a bullet to damage the front passenger-side tire if the shooter had been standing five feet from the driver-side window. In order for such damage to occur, the shooter would have to be standing on the passenger-side of the car.

At the end of the defense's direct examination, counsel asked whether, based on the ballistic evidence, Brundage thought Mrs. Cathey's account was consistent with his findings. The State objected, and the trial court sustained the objection. Nothing in the record indicates that the Defendant made an offer of proof as to what Brundage's testimony would be had he been allowed to answer the question.

On cross-examination, Brundage admitted that he was being paid for his services as an expert. He further admitted that he was neither provided a crime scene diagram, nor did he travel to the crime scene to make one. He also stated that he reviewed the photographs and video, but he did not examine any of the physical evidence in the case. However, Brundage stated that it was the responsibility of the police investigating the crime to conduct the crime scene investigation and take the measurements that he relied upon in making his report.

Lewis Grimes, III testified that he was with the Defendant when the shooting took place. They were at the convenience store when Mr. Cathey came in and spoke with the Defendant. Mr. Grimes and the Defendant left the store and started walking toward Mr. Grimes's residence. Mr. Cathey followed them outside, saying something about Facebook. According to Mr. Grimes, Mr. Cathey told the Defendant "quit calling my woman" and called the Defendant "a b**** a** n*****." Mr. Grimes testified that the Defendant did not respond.

Mr. Grimes stated that Mr. Cathey got into his vehicle and then drove toward the Defendant as if he was going to strike the Defendant with his vehicle. At that point, the Defendant discharged his weapon. Mr. Cathey drove away, and the Defendant and Mr. Grimes continued walking to Mr. Grimes's residence. Mr. Grimes did not see the Defendant draw his gun until Mr. Cathey's vehicle approached him.

Mr. Grimes said that he had not spoken to the police or given a statement regarding his observations of the shooting because he did not want to get involved with the case. He further admitted that neither he nor the Defendant called 911 after they left the scene. The Defendant left Mr. Grimes's residence later in the evening. They did not discuss the shooting, and Mr. Grimes did not know what the Defendant did with the gun. Mr. Grimes maintained the Defendant was never near the Catheys' vehicle until it approached him; instead, he was near the dumpster located next to the store throughout the entire incident.

The Defendant testified that on the night of the shooting he was at the convenience store with Mr. Grimes when Mr. Cathey came in. While in the store, Mr. Cathey said something to the Defendant. The Defendant could not recall what was said but stated that he stepped away to avoid a confrontation. The Defendant said that he wished to avoid Mr. Cathey "because he had made some threats . . . on Facebook to me." As the Defendant was walking away from the store, Mr. Cathey exited the store, told the Defendant "I got you b**** a** n*****," got into his vehicle, and drove toward the Defendant. The Defendant stated that he believed Mr. Cathey's vehicle would have hit him had the Defendant not drawn his weapon and fired. The Defendant maintained that he did not draw his weapon until Mr. Cathey's vehicle approached him and only did so in self-defense. He also stated that he was

standing in front of Mr. Cathey's vehicle when he drew his weapon, and his weapon was pointed toward the ground when he fired the first shot. He further admitted that he was intoxicated at the time of the shooting.

The Defendant denied telling the investigator that he was not at the convenience store on the evening in question. He further claimed that he was drunk at the time of his interview. The Defendant also admitted that he did not call 911 after the shooting because he knew he was not supposed to have a firearm due to previous convictions. He further stated that he did not tell the police he had acted in self-defense when they questioned him because the warrant for his arrest had already been issued. Instead, he believed it was better to wait until he had been appointed counsel to assert a claim of self-defense.

Investigator Frank Cagle, with the Jackson Police Department testified that he interviewed the Defendant several days after the shooting. In that interview, the Defendant admitted that he knew the victims but denied being at the scene on the night in question. The Defendant also stated that he did not own a gun and did not remember where he was on the night of the shooting. Investigator Cagle further testified that the Defendant was given an opportunity to sign his statement, but he refused to put anything in writing or to sign anything.

The jury returned a verdict of guilty on the lesser-included charge of reckless endangerment for count one; guilty of aggravated assault for count two; not guilty of aggravated assault for count three; and guilty of unlawful employment of a firearm during the commission of or attempt to commit attempted first degree murder for count four. The Defendant's motion for a new trial or verdict of acquittal was denied following a hearing. This timely appeal followed.

## Analysis

### I. Expert Testimony

The Defendant argues that, by precluding his expert from commenting on Mrs. Cathey's prior statement in relation to his findings, Brundage was unable to testify as to his complete opinion in the field of ballistics. While Mrs. Cathey's testimony may have been impeached, the Defendant contends that his expert should have been allowed to explain how her prior statement related to the ballistic evidence. The State argues that the trial court acted within its discretion when it prohibited such testimony. The State asserts that Brundage's opinions regarding the surveillance video and evidence were enough for the jury to draw its own conclusions, and allowing Brundage to comment on the credibility of Mrs. Cathey's testimony would invade the province of the jury as fact-finder. We agree with the State.

The admissibility of expert testimony is governed by Tennessee Rules of Evidence 702 and 703. State v. Copeland, 226 S.W.3d 287, 301 (Tenn. 2007); Brown v. Crown Equip. Corp., 181 S.W.3d 268, 273 (Tenn. 2005). Tennessee Rule of Evidence 702 states, "If scientific, technical, or other specialized knowledge will *substantially assist* the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." (emphasis added). Tennessee Rule of Evidence 703 instructs the courts to "disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness."

It is well established that questions regarding the admissibility, relevancy, and competency of expert testimony is left to the broad discretion of the trial court. Brown, 181 S.W.3d at 273; State v. McLeod, 937 S.W.2d 867, 871 (Tenn. 1996). "We may not overturn the trial court's ruling admitting or excluding expert testimony unless the trial court abused its discretion." Brown, 181 S.W.3d at 273; see also McLeod, 937 S.W.2d at 871. A trial court abuses its discretion "when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." State v. Scott, 275 S.W.3d 395, 404 (Tenn. 2009). Any abuse of discretion must appear on the face of the record. State v. Campbell, 904 S.W.2d 608, 616 (Tenn. Crim. App. 1995).

In the context of a criminal trial, expert testimony carries a special danger of undue prejudice because of its "aura of special reliability." State v. Ballard, 855 S.W.2d 577, 561 (Tenn. 1993) (citing United Stated v. Green, 548 F.2d 1261, 1268 (6th Cir. 1977)). Expert testimony "may lead the jury to abandon its responsibility as the fact finder and adopt the judgment of the expert." Id. Moreover, Tennessee law clearly states, "Comment upon the credibility of witnesses is not a proper subject for expert testimony." State v. Edward H. Jones, No. 03-C-9301-CR-00024, 1994 WL 529397, at *4 (Tenn. Crim. App. Sept. 15, 1994) (citations omitted). Determining the credibility of witnesses and the weight to be given to their testimony "rests exclusively with the jury." Id. at *5.

In this case, the trial court accepted Brundage as an expert witness in ballistics, trajectory analysis, and shooting scene reconstruction, and he was allowed to testify as to his scientific findings based on his examination of the evidence. From that evidence, Brundage was able to create a narrative of the shooting and conclude that it would not have been possible for a bullet to damage the front passenger-side tire if the shooter, hypothetically, had been standing a few feet from the driver-side window. However, the trial court would not allow Brundage to testify as to whether his findings were consistent with Mrs. Cathey's prior statement.

Under Tennessee Rule of Evidence 702, an expert's testimony must substantially assist the jury to determine a fact at issue. Brundage's scientific findings fall under this requirement insofar as his findings explain the relative position of the shooter to the damage on the vehicle. However, any comments he may have had regarding the credibility of other witnesses invades the province of the jury. Questions of witness credibility are exclusively resolved by the fact-finder. As such, we hold that the trial court did not abuse its discretion when it excluded Brundage's testimony regarding the consistency of his findings with the testimony of other witnesses.

This issue is without merit.

## II. Mutually Exclusive Verdicts

The Defendant contends that his conviction for employing a firearm during the commission of a dangerous felony should be overturned because the jury failed to convict him of the underlying felony, attempted first degree murder. Instead the jury convicted him of the lesser-included offense of misdemeanor reckless endangerment, and the Defendant asserts that these verdicts are mutually exclusive. The State argues that the verdicts are simply inconsistent and should not be overturned. We agree with the State and hold that, even if we were inclined to adopt the mutually exclusive verdict doctrine, it would not apply to the facts of this case.

The Defendant recognizes that the mutually exclusive verdict doctrine has not been adopted in Tennessee but nevertheless urges us to do so now. However, just last year this court explicitly declined to adopt the mutually exclusive verdict doctrine in State v. Marlo Davis, No. W2011-01548-CCA-R3-CD, 2013 WL 2297131, at *11 (Tenn. Crim. App. May 1, 2013), *perm. app. granted* (Tenn. Nov. 13, 2013).[1] In states that recognize the doctrine, it applies when "a guilty verdict on one count logically excludes a finding of guilty on the other." State v. Chris Jones, No. W2009-01698-CCA-R3-CD, 2011 WL 856375, at *10 (Tenn. Crim. App. March 9, 2011), *perm. app. denied* (Tenn. Aug. 25, 2011) (quoting Jackson v. State, 577 S.W.2d 570, 573 (Ga. 2003)). In finding the defendant guilty on both counts, the jury "necessarily reache[s] two positive findings of fact that cannot logically mutually exist." Id.; see also State v. James Snipes, No. W2011-02161-CCA-R3-CD, 2013 WL 1557367, at *8 (Tenn. Crim. App. April 12, 2013), *perm. app. denied* (Tenn. Sept. 13, 2013). For example, verdicts would be mutually exclusive if the jury returned a guilty verdict "on two counts arising from the same act where one count requires proof of a negligent act and the other count requires evidence of an intentional act." James Snipes, 2013 WL 1557367, at *8; see also Chris Jones, 2011 WL 856375, at *10.

---

[1]We note that State v. Marlo Davis is currently pending review by the Tennessee Supreme Court.

Conversely, inconsistent verdicts "arise when a defendant is convicted of one offense and acquitted of another offense, although both offenses arose from the same criminal transaction." James Snipes, 2013 WL 1557367, at *8. "The key difference between the two doctrines is that mutually exclusive verdicts involve two positive findings of fact, whereas inconsistent verdicts involved one positive finding of fact and 'the failure to make a positive finding of fact.'" Chris Jones, 2011 WL 856375, at *10 (quoting Jackson, 577 S.W.2d at 57.

Inconsistent verdicts have long been permitted in both the state and federal systems. Such verdicts were first recognized in Dunn v. United States, 284 U.S. 390, 393 (1932). In that case, the defendant was convicted of maintaining a common nuisance by keeping intoxicating liquors for sale at a specified location but was acquitted of the possession and sale of intoxicating liquors, even though the evidence was the same for all three counts. In upholding the verdict, the United States Supreme Court stated:

> The most that can be said in such cases is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity.
>
> That the verdict may have been a result of compromise, or of a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation or inquiry into such matters.

Id. at 393-94 (quotation marks and citations omitted).

Over 50 years later, the same court upheld the Dunn jury lenity rationale to support inconsistent verdicts in United States v. Powell, 469 U.S. 57 (1984).[2] Further, the Powell Court noted that the Dunn rule "embodies a prudent acknowledgment of a number of factors." First, "inconsistent verdicts – *even verdicts that acquit on a predicate offense while convicting on the compound offense* – should not be necessarily interpreted as a windfall to the Government at the defendant's expense." Powell, 469 U.S. at 65 (emphasis added). In such cases, there is no way to tell why the jury returned an inconsistent verdict, but when it happens the Government is precluded from redressing any perceived error on appeal by application of the Double Jeopardy Clause. Id. The court reasoned,

---

[2]In Dunn, the U.S. Supreme Court also reasoned that, had separate indictments been presented for each offense and each was separately tried, an acquittal on one charge would not allow the defendant to plead *res judicata* as to the other offenses. Dunn, 284 U.S. 393. However, in Powell the Court noted that the *res judicata* element of Dunn could no longer support inconsistent verdicts. Powell, 469 U.S. at 64. However, as we explain, the Powell Court upheld Dunn under the jury lenity rationale.

Inconsistent verdicts therefore present a situation where 'error,' in the sense that the jury has not followed the court's instructions, most certainly has occurred, but it is unclear whose ox has been gored . . . For us, the possibility that the inconsistent verdict may favor the criminal defendant as well as the Government militates against review of such convictions at the defendant's behest.

Id. Additionally, the court noted that defendants are already protected against irrational jury verdicts by sufficiency of the evidence review. Id. at 67. However, the court took pains to note that such "review should be independent of the jury's determination that evidence on another count was insufficient." Id.

Second, the Powell Court reasoned that a defendant misunderstands the nature of inconsistent verdicts when he argues than an acquittal on a predicate offense necessitates a finding of insufficient evidence for the compound offense. Id. at 68. Such argument "necessarily assumes that the acquittal on the predicate offense was proper – the one the jury 'really meant.' This, of course, is not necessarily correct; all we know is that the verdicts are inconsistent." Id. at 68. Because appellate courts cannot know the jury's motivations in reaching their verdicts, inconsistent verdicts are not subject to review. Id. at 68-69.

The Tennessee Supreme Court specifically adopted the Dunn jury lenity rationale in Wiggins v. State, 498 S.W.2d 92, 93 (Tenn. 1973). In so doing, the court stated, "Consistency in verdicts for multiple count indictments is unnecessary." Id. at 94. Under *Wiggins* each count is treated as a separate indictment. Id. at 95. Accordingly, in reviewing the verdict, this Court looks solely to the evidence underlying the convicted offense to determine whether there is sufficient evidence to permit a rational fact finder to find the defendant guilty beyond a reasonable doubt. State v. Cynthia J. Finch, No. E2011-02544-CCA-R3-CD, 2013 WL 6174832, at *13 (Tenn. Crim. App. Nov. 22, 2013). "We will not attempt to divine some hidden meaning from the jury's actions regarding a separate count of the indictment."

In a case notably similar to the scenario before us, State v. Tony Scott Walker, No. 02C01-9704-CC-00147, 1997 WL 746433 (Tenn. Crim. App. Dec. 3, 1997) *perm. app. denied* (Tenn. Sept. 21, 1998), the jury convicted the defendant of felony murder but acquitted him for the predicate especially aggravated robbery charge. Tony Scott Walker, 1997 WL 746433, at *3. In upholding the jury's verdict, this Court reasoned, under Wiggins and Powell, that the Dunn rule permits inconsistent verdicts on the grounds that appellate courts will not attempt to uncover a jury's motivation behind a verdict. Id. at *4. As such, we held that our only determination when reviewing inconsistent verdicts is whether there is sufficient evidence to support the conviction, even if the jury acquitted on a predicate offense. Id. at *5.

The case before us today presents a textbook inconsistent verdict. The jury acquitted the Defendant for the predicate offense, choosing instead to convict him of the lesser-included offense of misdemeanor reckless endangerment, and convicted him on the compound offense. See Powell, 469 U.S. at 65. As such, the mutually exclusive verdict doctrine would not apply to these facts. Therefore, our only concern is whether there is sufficient evidence in the record to sustain the Defendant's conviction of employing a firearm during the commission of a dangerous felony. We consider this question independently of the jury's verdict for any other count in the indictment. See Wiggins, 498 S.W.2d at 93-94; Tony Scott Walker, 1997 WL 746433, at *5.

### III. Sufficiency of the Evidence

The Defendant argues that the evidence presented at trial was insufficient to sustain the jury's verdict but instead supports the Defendant's theory that he acted in self-defense. The State argues that it provided sufficient evidence for any rational trier of fact to convict the Defendant of reckless endangerment, aggravated assault, and employing a firearm during the commission of a dangerous felony. Upon review we hold that the record contains sufficient evidence to sustain the Defendant's convictions.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight and value to be given the evidence are resolved by the fact finder. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978), *superseded on other grounds by* Tenn. R. Crim. P. 33 *as stated in* State v. Moats, 906 S.W.2d 431 (Tenn. 1995). This Court will not reweigh the evidence. Id.

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted). On review the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007). As noted above, we review each count in a multi-count indictment separately. See Wiggins, 498 S.W.2d at 93-941; Tony Scott Walker, 1997 WL 746433, at *5.

We turn first to the Defendant's conviction for misdemeanor reckless endangerment as a lesser-included offense of attempted first degree murder. A person commits reckless endangerment when he or she "recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." Tenn. Code Ann. § 39-13-103 (2010). Viewing the evidence in a light most favorable to the State, the Defendant discharged his firearm in the direction of Mr. Cathey's vehicle when he knew Mr. Cathey was inside the vehicle. Two of the bullets struck Mr. Cathey's rear driver-side window and window frame respectively. At trial, the Defendant argued he acted in self-defense, but the jury clearly discredited his testimony and returned a verdict of guilty. Because we will not reweigh the evidence or question the jury's credibility determinations upon review, we hold that the evidence is sufficient to support the Defendant's conviction for reckless endangerment.

As to the Defendant's conviction for aggravated assault, under Tennessee law, "A person commits assault who . . . (2) [i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury." Tenn. Code Ann. § 39-13-101(a)(2) (2010). A person commits aggravated assault when he "[i]ntentionally or knowingly commits an assault as defined in § 39-13-101 and . . . (B) [u]ses or displays a deadly weapon." Tenn. Code Ann. § 39-13-102(a)(1)(B) (2011). Viewing the evidence in a light most favorable to the State, Mr. Cathey saw the Defendant point a gun in his direction, and he drove away in an attempt to remove himself from danger. The Defendant discharged his weapon, striking Mr. Cathey's vehicle. We find that the evidence is sufficient to support the Defendant's conviction for aggravated assault.

Finally, we turn to the Defendant's conviction for employing a firearm during commission of or attempt to commit a dangerous felony – attempted first degree murder. Under Tennessee law "[i]t is an offense to employ a firearm during the: (1) [c]ommission of a dangerous felony; [or] (2)[a]ttempt to commit a dangerous felony." Tenn. Code Ann. § 39-17-1324(b)(1)-(2) (2010). Criminal attempt as applied to the facts of this case is defined as:

> A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense: . . . (2) [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or (3) [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.[3]

---

[3]The trial court charged both Tennessee Code Annotated 39-12-101 (a)(2) and (a)(3).

Tenn. Code Ann. § 39-12-101(a)(2)-(3) (2010). First degree murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (2010).

The evidence presented at trial established that the Defendant had previously had a disagreement with Mr. Cathey over Facebook. On the night of the shooting, the Defendant followed Mr. Cathey out of the convenience store to his vehicle, pointed a gun at Mr. Cathey, and fired the weapon at Mr. Cathey's vehicle as Mr. Cathey drove away. Two of the bullets struck the rear driver-side window and window frame of the vehicle respectively – indicating that the Defendant was aiming at the person inside. Three spent shell casings were found across the street from the store where the Catheys' vehicle was parked; one spent shell casing was found near the dumpster. The Defendant argues that he was acting in self-defense as a result of Mr. Cathey's attempting to strike him with his vehicle, and he did not intend to try to kill Mr. Cathey when he fired the shots. However, the jury credited Mr. Cathey's version of events by returning a verdict of guilty for the offense of employing a firearm during the commission of a dangerous felony. We conclude that the evidence, viewed in a light most favorable to the State, is sufficient to support that conviction.

## Conclusion

For the reasons stated above we conclude that the trial court did not err in excluding a portion of the defense expert's testimony; the Defendant's conviction for employing a firearm during the commission of a dangerous felony is valid; and the evidence is sufficient to sustain the Defendant's convictions. Accordingly, we affirm the judgments of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE