# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs April 28, 2015

## STATE OF TENNESSEE v. DAVID LOUIS WAY

**Appeal from the Circuit Court for Sevier County**
**No. 14972-II     Richard R. Vance, Judge**

_____

### No. E2014-01246-CCA-R3-CD - Filed July 1, 2015

_____

The Defendant, David L. Way, pleaded guilty to burglary and misdemeanor theft. The trial court ordered concurrent probationary sentences of four years for the burglary conviction, and eleven months and twenty-nine days for the theft conviction. Thereafter, the Defendant was arrested for burglary and possession of burglary tools. The trial court issued a probation violation warrant and, after a hearing, revoked the Defendant's probationary sentence. On appeal, the Defendant contends that the trial court improperly ordered him to serve the remainder of his sentence in confinement for violating the terms of his probation, and that the trial court improperly admitted a Tennessee Bureau of Investigation firearms and tool mark examiner as an expert witness. After a thorough review of the record and applicable law, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR. and TIMOTHY L. EASTER, JJ., joined.

Heather N. McCoy, Sevierville, Tennessee, for the appellant, David Louis Way.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; James Dunn, District Attorney General; and George Ioannides, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case arises from the Defendant's arrest while serving a probationary sentence.

On August 24, 2010, the Defendant pleaded guilty to burglary and misdemeanor theft. The trial court ordered a probationary sentence of eleven months and twenty-nine days for the theft charge and a probationary sentence of four years for the burglary charge. One of the conditions of the Defendant's probationary sentence required him to "obey the laws of the United States, or any State in which [he] may be, as well as any municipal ordinances."

In August 2012, the Defendant was arrested in Sevier County, Tennessee, on charges of burglary and possession of burglary tools. Millard Spurgeon, a co-defendant, was also charged for these offenses. A probation violation warrant was issued, and the trial court held a consolidated probation revocation hearing wherein the parties presented the following evidence[1]: Stephanie Randles, a Tennessee State Bank employee, identified a photograph of an ATM that she installed at Gatlinburg-Pittman High School. Ms. Randles confirmed that the machine was at that location on August 19, 2012, and in good working order. Following the burglary, Ms. Randles found the ATM "completely destroyed" and "beyond repair." She stated that the ATM was replaced at the cost of $3,044.15. She noted that $1,540 was removed from the ATM during the burglary as an additional loss to the bank. On cross-examination, Ms. Randles agreed that she was not present during the burglary, but she stated that she went to check on the machine after notification of the robbery.

John Ogle, the Gatlinburg-Pittman High school principal, testified that he was notified by "the monitoring company" that the school alarm was engaged. Mr. Ogle consented to the company requesting the police and then drove to the school. When he arrived, the police were already present, and he found that the ATM, "a couple" vending machines, and a change machine had been broken into as well as some storage areas and a few closets. Mr. Ogle stated that the closed-circuit television system was used to determine that the perpetrators had entered through a window in the teacher's lounge.

Mr. Ogle testified that the ATM belonged to Tennessee State Bank and that the school received a fee for allowing the placement of the ATM. He noted damage to the ATM and damage to several doors in the facility. He said that the school maintenance department informed him that the damage was "a few hundred dollars." Mr. Ogle identified photographs taken from the surveillance footage. In the photographs, two men with their heads and faces covered were seen walking throughout the building. One of the men carried a crow bar and approached the ATM. In one photograph, various pieces of debris were lying on the floor around where the man leaned over the ATM.

The State played a clip of the surveillance video from August 19, 2012, at 2:40 a.m.

---

[1] At the consolidated hearing, both the Defendant and his co-defendant, Mr. Spurgeon, presented evidence. We summarize only the evidence that pertains to the Defendant's appeal.

2

Mr. Ogle observed that the suspect walking had a distinctive gait, a "high lift of the heel." Mr. Ogle identified the same gait at other points in the footage. One suspect was carrying a crow bar and wearing a dark-colored "hoodie," camouflage pants, and gloves. The other suspect, with the distinctive gait, wore a camouflage coat, a red backpack, gloves, a toboggan to cover his face, and "darker-colored bottom wear." In the video footage, time stamped 2:42 a.m., Mr. Ogle stated that it appeared the man with the distinctive gait was carrying "some sort of prying device."

Mr Ogle testified about a portion of the video footage as follows:

> The first individual had the crowbar wedged between the door of the ATM and the body of the unit. He placed his feet on the crowbar and his hands behind him to grant himself leverage trying to pry the door open. Now he's moved up the machine and is working on the top portion where the user interface is.

The other suspect then entered the area and laid down his backpack, from which he produced another device to work on opening the machine. The two suspects left the building at 2:43 a.m. and returned at 3:00 a.m. A portion of the ATM was open at this point, and one of the suspects began working in an area around the "cash receptacle." The surveillance footage then showed both suspects using a variety of tools to open the ATM. Approximately forty minutes later, "a large container c[a]me[] out," and the suspects begin chiseling at it with a hammer and a prying device. Once this container was opened, the suspect with the distinctive gait removed the cash from the container.

On cross-examination, Mr. Ogle testified that the suspects were inside the school from approximately 2:30 to 4:30 a.m. Mr. Ogle stated that he could not identify the Defendant or his co-defendant based upon surveillance footage.

Jamila Byrd testified that in August 2012, she worked at McKinney's Market. She recalled that on the morning of August 19, 2012, Officer Gary McCarter came into the store for a cup of coffee. While there he provided her with a description of two men the police were looking for, "a taller [man who] . . . had a lazy eye, and then the other gentleman was kind of short and did some kind of walk." Ms. Byrd told Officer McCarter that she had not seen two men meeting that description. Later that same morning, between 10:30 and 11:00 a.m., a "tall gentleman" came into the store and bought lottery tickets. Ms. Byrd identified the Defendant in court as the man who bought the lottery tickets on August 19, 2012. Ms. Byrd said that the Defendant produced a "wad of money" from his front right pocket and spent approximately a "couple of hundred dollars" for lottery tickets. Fifteen to twenty

minutes later, the other suspect with the distinctive gait entered the market. Ms. Byrd viewed the video surveillance footage from the school burglary and stated that the gait of the suspect was consistent with the gait of the man in the market on the morning of August 19.

Ms. Byrd testified that, upon noticing the man's gait, she called Officer McCarter. When the police arrived, the two suspects were sitting in a blue minivan. The Defendant was seated in the driver's seat, and the other suspect was seated in the passenger seat. Ms. Byrd admitted that she had taken money from McKinney's Market while employed there. Ms. Byrd stated that no promises had been made to her regarding that theft prosecution.

Gary McCarter, a Gatlinburg Police Department officer, testified that he was involved in the Gatlinburg-Pittman High School burglary investigation. He stated that he reported to the high school in the early morning hours of August 19, 2012. Officer McCarter observed the vandalized ATM machine and damage to other vending machines and doors. He also watched the surveillance video. While watching this video, Officer McCarter noted distinct factors about the intruders such as their clothing, mannerisms, height and weight. He stated that the "lookout," who kept going to the front door of the school to see if someone was approaching, "raise[d] his leg in a curious manner." He mentioned specifics of the suspects' descriptions to several people, one of which was Jamila Byrd. He spoke with Ms. Byrd at McKinney's market at around 8:00 a.m. on August 19, 2012. Later that morning, he received a phone call from Ms. Byrd. Ms. Byrd told Officer McCarter that two men matching his description were at the market.

Officer McCarter testified that he dispatched officers to the market. When Officer McCarter arrived, the police had already detained the Defendant and Mr. Spurgeon. The Defendant gave police officers permission to search his vehicle, and the police seized clothing and tools, which included two crowbars. The clothing was consistent with the items worn by the suspects in the video surveillance footage. Officer McCarter said that it had rained at some point during that night, and that the clothing found in the vehicle was wet. He also noted that the license plate for the vehicle was found inside the vehicle rather than displayed at the rear bumper.

Rodney Burns, a Gatlinburg Police Department officer, testified that he sent the tools found in the Defendant's vehicle and the door of the ATM machine to the Tennessee Bureau of Investigation ("TBI") for analysis. Detective Burns stated that this case was dismissed at the preliminary hearing, but he presented the evidence to the grand jury, and the Defendant was indicted. Detective Burns said that he attended the Defendant's parole hearing where the Defendant admitted ownership of the tools and the camouflage clothing retrieved from the vehicle. He also admitting using his mother's van and displaying the wrong license tag on the van.

On cross-examination, Detective Burns agreed that the police did not recover a backpack, cash, or masks. When asked if the police found any physical evidence at the high school, Detective Burns responded that one of the tools found in the van matched the tool mark on the ATM machine and a paint transfer from another of the tools matched the ATM paint. He agreed there was no DNA or fingerprint evidence but explained that the suspects wore gloves.

Teri Arney, a TBI firearms and toolmark examiner, testified as an expert in the field of toolmark examination. Agent Arney analyzed a pry bar or "cat's paw" recovered in this case. Based on her analysis, she found three usable marks and concluded that the pry bar found in the Defendant's vehicle was used to make all three marks on an ATM component recovered from Gatlinburg-Pittman High School.

On cross-examination, Agent Arney agreed that toolmark examination is a visual determination based upon the comparison of surface features. She explained that there is a verification process that requires another qualified examiner to also conduct an analysis. Agent Arney stated that, in her opinion, she was completely certain that the pry bar found in the Defendant's vehicle made the marks on the ATM component. Agent Arney agreed that it was possible for two examiners to be wrong but "very unlikely." Agent Arney agreed that she did not know how the tools were stored before they came into her possession.

Annette Way, the Defendant's mother, testified that the Defendant came home around 8:00 p.m. on Saturday night, August 18, 2014, laid down on the couch, and went to sleep. She said he was sick. She recalled that the Defendant left her home at around 8:00 a.m. on Sunday morning. Ms. Way stated that she would have known if the Defendant "snuck out" of her home because she had an alarm "on [her] driveway." Ms. Way stated that she would not lie for her son.

On cross-examination, Ms. Way testified that, on that night, the Defendant slept upstairs while she slept downstairs in the living room. Ms. Way confirmed that the Defendant drove her van when he left on Sunday morning.

At the conclusion of the hearing, the trial court made the following findings:

Essentially the proof is circumstantial. The Court in viewing that proof has considered and seen the evidence by recording, the surveillance camera, photographic copies of certain portions of it, physical evidence, the statements and arguments of counsel, testimony of witnesses, and the entire record. The standard of proof for violation of probation is probable cause. Based upon the evidence, it appears that both defendants match the description of the

5

individuals on the videotape committing the burglary and theft as to the size, as to individual physical characteristics and generally matched the clothing that was found in the van the next day. In particular, the height of the defendants matched the relative heighths [sic] of the two men on the videotape. Their faces were covered during the theft but the general physical description is the same. . . . The following day [the defendants] were observed at McKinney's Market. The police were called. [The Defendant] gave consent to search the van. In the van were found wet clothing, which again matched the appearance of the clothing worn by the men committing the burglary. The testimony was that it rained that night, the ground was wet. And that certain tools were taken into evidence.

We heard testimony from Ms. Arney, who is qualified with many years experience as a toolmark identification expert, that she described her procedure for examining the toolmarks on the portions of the ATM machine matching them with one of the tools found in the van, that that tool matched three individual markings on the ATM machine. And her testimony, she found it was conclusive and one hundred percent certain that those marks were made by the tools found in [the Defendant's] vehicle. While the defense has argued and [conducted] cross-examination, there is no evidence to contradict that testimony, and the Court finds that she was a credible and qualified expert witness.

While each of the defendant's [sic] mothers have offered an alibi, there can be no alibi for the tool found in the van, which was conclusively testified to have been used in this burglary and theft. Witnesses may be mistaken about certain things.

But from all of the evidence, the Court does find that there is probable cause to believe that both [the Defendant] and Mr. Spurgeon committed the burglary, vandalism and theft at the school. . . . So the Court does find that each of these men have violated the terms of their respective probation by finding there is probable cause to believe that they committed the burglary while on probation.

In [the Defendant's] case, he is on regular state probation, has a fixed sentence. In reviewing the records and the notices filed by the State with respect to the current pending case, [the Defendant] has numerous previous felony convictions, that because of his extensive prior criminal history that probation is not really an option, that it would diminish the seriousness of the

6

offense, and therefore, further probation is denied and [the Defendant] is ordered to serve the balance of his sentence in the Department of Correction.

It is from this judgment that the Defendant now appeals.

## II. Analysis

The Defendant asserts that the evidence does not support the trial court's probation revocation and that the trial court improperly admitted a Tennessee Bureau of Investigation firearms and tool mark examiner as an expert witness. The State responds that the trial court properly revoked the Defendant's probation because the evidence established that the burglary was committed while the Defendant was on probation. As to the challenge to the expert witness, the State responds that expert testimony regarding microscopic tool marks is admissible and Agent Arney's extensive training and experience supports the trial court's determination that she was qualified as an expert witness. We agree with the State.

### A. Probation Revocation

In Tennessee, the procedure for a revocation of a probation sentence is set out in Tennessee Code Annotated section 40-35-311 (2014). The statute provides, in part, as follows:

> Whenever it comes to the attention of the trial judge that any defendant, who has been released upon suspension of sentence, has been guilty of any breach of the laws of this State or has violated the conditions of probation, the trial judge shall have the power to cause to be issued under such trial judge's hand a warrant for the arrest of such defendant as in any other criminal case.

T.C.A. § 40-35-311(a).

A trial court may revoke probation upon its finding by a preponderance of the evidence that a violation of the conditions of probation has occurred. T.C.A. § 40-35-311(e)(2014). "In probation revocation hearings, the credibility of witnesses is to be determined by the trial judge." *State v. Mitchell*, 810 S.W.2d 733, 735 (Tenn. Crim. App. 1991). If a trial court revokes a defendant's probation, its options include ordering confinement, ordering the sentence into execution as originally entered, returning the defendant to probation on modified conditions as appropriate, or extending the defendant's period of probation by up to two years. T.C.A. § § 40-35-308(a), (c), -310 (2014); *see State v. Hunter*, 1 S.W.3d 643, 648 (Tenn. 1999).

The judgment of the trial court in a revocation proceeding will not be disturbed on appeal unless there has been an abuse of discretion. *See State v. Shaffer*, 45 S.W.3d 553, 554 (Tenn. 2001); *State v. Smith*, 909 S.W.2d 471, 473 (Tenn. Crim. App. 1995). In order for this Court to find an abuse of discretion, "there must be no substantial evidence to support the conclusion of the trial court that a violation of the conditions of probation has occurred." *State v. Shaffer*, 45 S.W.3d 553, 554 (Tenn. 2001). Further, finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *Shaffer*, 45 S.W.3d at 555 (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).

In the present case, the Defendant was arrested for burglary of a local high school. The record provided substantial evidence to support the trial court's revocation of probation, including surveillance footage of the burglary, clothing found in the Defendant's vehicle matching the clothing worn by the suspects in the surveillance video footage, as well as the tools used in the burglary, also found in the Defendant's vehicle.

After the trial court found that the Defendant had violated his probation, it retained discretionary authority, pursuant to Tennessee Code Annotated section 40-35-310(b), to order the Defendant to serve his sentence in incarceration. The determination of the proper consequence of a probation violation embodies a separate exercise of discretion. *Hunter*, 1 S.W.3d at 647. Case law establishes that "an accused, already on probation, is not entitled to a second grant of probation or another form of alternative sentencing." *State v. Jeffrey A. Warfield*, No. 01C019711-CC-00504, 1999 WL 61065, at *2 (Tenn. Crim. App., at Nashville, Feb. 10, 1999), *perm. app. denied* (Tenn. June 28, 1999).

The record clearly reflects that the Defendant violated the terms of his probation by committing a new offense while on probation. Accordingly, the trial court was justified in revoking the Defendant's probation, and it was within the trial court's authority to order the Defendant to serve his original sentence upon revoking the Defendant's probation sentence. The Defendant is not entitled to relief.

### B. Expert Witness

The Defendant asserts that the tool mark evidence in this case is unreliable and, therefore, the admission of Agent Arney's testimony as an expert witness is contrary to Tennessee Rule of Evidence 702. The State responds that expert testimony regarding microscopic tool marks is admissible in Tennessee and Agent Arney was properly qualified as an expert witness.

As stated by *McDaniel v. CSX Transp., Inc.*, "[i]n general, questions regarding the

admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court." 955 S.W.2d 257, 263 (Tenn. 1997) (citing *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993)). "The trial court's ruling in this regard may only be overturned if the discretion is arbitrarily exercised or abused." *McDaniel*, 955 S.W.2d at 263-64. Specifically, the rules that govern the admissibility of such evidence are Tennessee Rules of Evidence 702 and 703. Rule 702 of the Tennessee Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Rule 703 of the Tennessee Rules of Evidence provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

In addition to complying with Rules 702 and 703, the evidence must be relevant under Rule 401 of the Tennessee Rules of Evidence. *McDaniel*, 955 S.W.2d at 264 n.8. "The trial court, therefore, must determine that the expert testimony is reliable in that the evidence will substantially assist the trier of fact to determine a fact in issue and that the underlying facts and data appear to be trustworthy." *Brown v. Crown Equipment Corp.*, 181 S.W.3d 268, 274 (Tenn. 2005).

The State's evidence in qualifying the Agent Arney as an expert in the area of tool mark analysis showed that she held a bachelor's degree in chemistry. She had worked in the TBI laboratory for seventeen years, and she had undergone various Forensic Firearms Identification trainings, courses, and seminars. Agent Arney received her Association of Firearms and Toolmark Examiners Certification in Firearm Evidence Examination and Identification in 2005. She had previously been qualified as an expert and had testified as a tool mark analyst in "over a hundred" cases. Agent Arney explained that firearms and toolmark examination is a discipline of forensic science that deals with the analysis of tools

9

and the toolmarks they produce and matching those toolmarks back to a specific tool.

Based upon the record, we conclude that the trial court acted within its discretion in ruling that the witness was qualified to testify as an expert.  It is clear that she possessed scientific, technical, and specialized knowledge, experience, and training that, when relevant in a given case, would substantially assist the trier of fact.  The Defendant has shown no error in the trial court's acceptance of the witness as an expert.

### III. Conclusion

Based on the foregoing reasoning and authorities, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE