IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 21, 2015 Session

## MICHAEL WATSON v. KARLA MYERS

**Appeal from the Chancery Court for Williamson County**
**No. 42155     Robbie T. Beal, Judge**

_____

**No. M2014-01862-COA-R3-CV – Filed October 7, 2015**
_____

In this post-divorce dispute, Father argues that the trial court erred in failing to make him the primary residential parent because of Mother's alleged failure to facilitate a close relationship between Father and the child. The trial court found a material change in circumstances, but concluded that a change in the primary residential parent was not in the best interest of the child. We affirm because the evidence does not preponderate against the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and RICHARD H. DINKINS, J., joined.

Connie Reguli and Julia Shaver, Brentwood, Tennessee, for the appellant, Michael Watson.

Casey Ashworth, Franklin, Tennessee, for the appellee, Karla Myers.

**OPINION**

FACTUAL AND PROCEDURAL BACKGROUND

Karla Myers ("Mother") and Michael Watson ("Father") were married in 2003 in Illinois. The parties moved to California in November 2003 and had a child, Kloe, in June 2004. In 2005, Mother and Father separated, and Mother moved to Oregon with Kloe to live with Father's parents. The parties divorced in Oregon in January 2006. By agreement, Mother was granted sole legal custody of Kloe.

Mother married John Myers ("Stepfather") in November 2008. Thereafter, Kloe lived with Mother, Stepfather, and Keenan (her stepbrother). After marrying Stepfather, Mother relocated to Arizona, then to Williamson County, Tennessee. In the summer of 2013, Stepfather accepted a new position in Illinois. Father objected to Mother moving with Kloe.

At the time of the hearing in May 2014, Father was a resident of California and was married to Jennifer ("Stepmother"). He had been a Marine for over 19 years and had been deployed four times since Kloe's birth.

On June 26, 2013, the Williamson County Chancery Court entered an agreed order registering the Arizona custody orders in the State of Tennessee. In July 2013, Father filed a Petition to Modify Parenting Plan and for Restraining Order. The petition summarizes the parenting time orders entered by the Arizona court: Father had parenting time every spring break and fall break, four weeks every summer, three weekends every year in Arizona, and every Father's Day; winter break was divided and Thanksgiving alternated. All round trip air travel was to be between Nashville and Los Angeles airports.

In his petition, Father alleged that there had been a substantial change in circumstances justifying a modification of the parenting plan and a change of custody. Father asserted the following substantial change in circumstances:

a.      The Mother has interfered with the Father's parenting time and relationship with the minor child.

   i.      The Mother severely restricts and limits the Father's phone contact with the minor child. Often not answering or returning calls.

   ii.      Upon information and belief, the Father's calls with the minor child are monitored.

   iii.      Upon information and belief, the Mother tells the minor child that her father does not want to see or talk to her.

   iv.      Mother will not allow the minor child to have pictures of the father or his family. The step-father recently mailed to the Father the minor child's photo album containing pictures of the Father and his family members and pictures of the minor child's visit with the Father in California. In the past, the step-

2

father has disposed of a similar photo album containing pictures of the Father.

v.  Additionally, the Mother and/or the step-father have taken away other items given to the minor child by the Father.

vi.  The minor child acts as if she is afraid to be caught speaking to the Father and is not allowed to talk about her father to her family members.

b.  In June 2012 (after the Mother's petition to modify the Father's parenting time was denied by the Arizona court), the Mother moved from Arizona to Tennessee with the minor child. The Mother gave the Father very little notice and the Father only learned more specific details about the move when the Father called the minor child and she was driving to Tennessee.

i.  The Mother's move to Tennessee has restricted the Father's parenting time as he is no longer able to exercise his three weekends per year as a result of the distance between the parties.

c.  The Mother has complicated airfare travel for the Father's parenting time requiring the parties to return to court several times, most recently in February 2013.

d.  On July 11th, 2013 the Mother emailed the Father and again informed him that she was moving with the minor child from Tennessee to Illinois. The Mother made an appearance in court in Arizona in May 2013 and entered an Agreed Order to register the custody orders in Tennessee in June 2013, but failed to inform the Father of her intention of moving until July 2013. The Mother's anticipated move will occur prior to August 14th, 2013. The Mother has provided little details.

Father went on to assert that it was in the child's best interest that the parenting plan be modified to make him the primary residential parent. He also requested an immediate order to enjoin Mother from removing the child from Tennessee.

Mother responded by filing a motion to allow her to relocate with the child. She asserted that she had a reasonable purpose for wanting to move to Illinois, namely Stepfather's job offer and the presence of relatives in the area. Father filed a motion to

3

prohibit Mother from relocating and to continue her motion. Mother filed a motion to dismiss Father's petition for a restraining order, as well as an answer to Father's petition. On July 30, 2013, the court heard Mother's motion to relocate and Father's motion in opposition. In an order entered on August 13, 2013, the court ordered that Mother's motion to relocate be denied, that the parties would complete discovery within thirty days, and that the parties would attend mediation.

On September 10, 2013, the court[1] held a hearing on Father's motion to depose Stepfather, Mother's motion to dismiss Father's petition for a restraining order, and Mother's motion to set the case for trial. Father's motion to depose Stepfather was granted. The court denied Mother's motion to dismiss Father's petition for a restraining order, but Mother was allowed to relocate to Illinois *pendente lite*. The case was set for trial over two days in May 2014.

Father filed a motion in limine to prohibit the testimony of Tracy E. Steyer, the child's counselor. The grounds for this motion will be discussed more fully below as this is an issue on appeal. At the beginning of the first day of trial, May 29, 2014, the court denied Father's motion in limine.

The first trial witness was Ms. Steyer, who testified that she began seeing Kloe in May 2013 at the request of Mother, who was concerned about the effect on the child of the conflict between the parents. Ms. Steyer had a total of fifteen sessions with Kloe. Ms. Steyer opined that, as of the last session, a week prior to the hearing, Kloe's level of functioning was "probably to the lowest that I've seen her." Kloe was "extremely distressed" and did not want to speak to Ms. Steyer that day; she was crying. Ms. Steyer was of the opinion that Kloe was upset because she had become aware that Ms. Steyer was going to be speaking in court about some of the things the child had said in counseling.

Ms. Steyer testified that, if required to use the DSM,[2] she would give Kloe a diagnosis of a parent-child relationship problem. Otherwise, her clinical diagnosis was "loyalty strain," which in this case meant that Kloe felt that she "had to choose between her parents and that it's not okay for her to love both of her parents or speak of loving both of her parents in front of the other, or speak of missing, in particular, her mother in front of her father." After her second session with Kloe, Ms. Steyer spoke with Mother and advised her to make some behavioral changes, primarily that she needed to stop

---

[1] Judge Timothy Easter presided at this hearing.

[2] The "DSM" is *The Diagnostic and Statistical Manual of Mental Disorders*, a publication of the American Psychiatric Association, which provides standard criteria for the classification of mental disorders.

4

making derogatory comments about Father in the child's presence and stop "grilling" the child when she returned from visiting Father. As far as Ms. Steyer knew, Mother had taken these suggestions to heart and had complied with this advice.

Ms. Steyer had only had one conversation with Father, which was by telephone. Based on what Kloe had told her, Ms. Steyer was concerned that Father would question the child about her residential preference. Ms. Steyer testified that, when the child told Father that she wanted things to stay the same, Father cried. Kloe had overheard a conversation between Father and Stepmother that Mother would be divorcing Stepfather soon and that she only married him for his money. Kloe also told Ms. Steyer that, when she arrived at Father's house, she was required to leave her suitcase in the garage and then shower immediately. She had to wear clothes kept for her at Father's house. Kloe told Ms. Steyer that Stepmother "says that my mom dresses me like a hippie and that my clothes smell that come from my mom's house." According to Ms. Steyer, this was upsetting to Kloe, especially since she picked out a lot of her clothes. Father told Kloe not to refer to Keenan as her brother and that Keenan was the reason Father and Mother got a divorce. Ms. Steyer opined that, although Kloe enjoyed visiting Father, it was difficult for her to be away from home for a month in the summer; she would get homesick during that visit. Moreover, it was stressful for her to hear Stepmother make derogatory comments about Mother. Kloe had anxiety about flying, especially about having to change planes.

After Mother and Kloe moved to Illinois, Ms. Steyer agreed to continue counseling the child through Facetime. She opined that Kloe had acclimated to her new home and school. She stated that Kloe had a strong attachment to her mother and her stepfather as well as to her stepbrother, Keenan.

Ms. Steyer testified as to the recommendations she made in her report. She advised that there be no change of primary residential parent and stated: "[B]ecause of the trauma she incurs as a result of the ongoing parental conflict, it's my opinion that a change of primary residency might create even more disruption and emotional adjustment requirement on her part; that, I do believe, would compromise her emotional and psychological development and security."

Father was the next witness. He testified that he was currently stationed at Twentynine Palms, California and that he was a maintenance chief. The last time that he was deployed was 2010 through 2011. Father acknowledged that he had been married four times and that his third marriage was a "contract marriage," meaning that he married to give his spouse health insurance and to give him a place to store his things while he was deployed. His third wife had his power of attorney so that she could take care of his affairs while he was gone. Father testified that Kloe did not spend much time around the

5

third wife and that she had never complained to him about how the third wife treated her.

Father recently bought a house in Fallbrook, California, which he testified was about two and a half hours away from Twentynine Palms, but closer to Camp Pendleton; he had received orders to report to Camp Pendleton. Father was currently married to his fourth wife, Jennifer ("Stepmother"), whom he married in June 2012. Stepmother had a daughter named Courtney, who graduated from high school in 2013 and had been living with Father and Stepmother since they married. Father testified that he had been promoted to a higher position, although in the same job, and that his chances of being deployed were therefore diminished.

Father testified that he first learned that Kloe was going to a counselor when the child told him. He did not learn the identity of the counselor until the deposition in August 2013, after which he called Ms. Steyer and talked to her. Ms. Steyer was moving her office and was hurried, but she did not lead Father to believe that she had any concerns about Kloe. Father was not aware that the counseling continued after Mother and Kloe moved to Illinois.

Father testified that he and Stepmother had made a photo album for Kloe, and the child had picked the photos for it from all of her trips to California. Each time she came to visit, they would add more pictures. At the end of the summer of 2012, Father and Stepmother sent the photo album back to Arizona with her. She did not bring it with her the next time she came to California; she said it had probably gotten boxed up for the move to Tennessee. At Christmas 2012, Father gave Kloe another photo album, this one from the wedding of Father and Stepmother with pictures of Kloe and Courtney, who were both in the wedding. It included photos referring to Stepmother as "Mommy." Father sent that album home with Kloe, but it was mailed back to Father along with a letter. Stepfather told Father that it made both Mother and Kloe uncomfortable to have in their home. Stepfather further told Father that, after Father failed to keep the first album at his home as requested by Mother, Stepfather had "disposed" of it.

Father denied that he or Stepmother made derogatory comments about Mother in front of Kloe. Father testified that Kloe and Stepmother got along well and had fun "hanging out" together. Father admitted that he had asked Kloe, before he filed his petition, what her thoughts were about living with him. She did not express a preference one way or the other, so he proceeded. He denied crying in front of her when she answered his questions. He also denied saying that Mother and Stepfather were going to divorce. Father's explanation for why Kloe left her suitcase in the garage was that he had been accused previously of losing some of her clothes and that she was worried about getting her clothes from Mother's house dirty. He testified that he always asked her if there was anything in her suitcase that she wanted to get out. He denied telling her that

6

Keenan was not really her brother or that he was the reason for Mother's and Father's divorce. Father stated that he had never discussed with Kloe any need to change planes, and she had never expressed any fear of flying to him. Father testified that Kloe had heard Mother call him a "jackass," although the voicemail had been intended for him.

Father was asked to explain to the court why he believed it was in Kloe's best interest for him to be the primary residential parent. He stated:

> Kloe needs to be in a—in a home in a family situation where she can express herself and express how she feels about everybody without being ridiculed for it. She needs to be able to have full access to everybody that she wants to talk to, and I'm not going [to] restrict her from that. If she wants to, you know, talk to her mother, she can. She's not gonna be directed or told or anything otherwise on how to feel about anybody. And it's just—it's the upbringing. In my opinion, the upbringing would be better.

Father feared that, "if things don't change, I think I'll be spending every amount of time I have with Kloe reassuring her that I'm her father and that . . . I'm not a terrible person." Based upon his communications with Stepfather, Father felt that he was not treated as Kloe's father, but as "an inconvenience."

Father submitted two proposed parenting plans, one of which would make him the primary residential parent and give Mother a schedule similar to the one Father had for the last several years. The other proposed parenting plan was for split parenting, where Kloe would be primarily with Father for one year and primarily with Mother for the next year.

Father testified that, if he was deployed, he wanted Stepmother, instead of Mother, to take care of Kloe. Father acknowledged that he had four children, but he did not visit at all with two of them. When asked why he had not tried to resume seeing those two children, Father replied that, "At this point, it's just a money pit."

Mother was the next witness after Father. She stated that she and Stepfather married in 2008 after dating since 2006. Mother did seasonal work at H & R Block preparing tax returns. Regarding the move to Illinois, Mother explained that Stepfather worked for a big real estate company (C.B.R.E.), the same company he worked for in Arizona; he had moved with that company to Tennessee. Then, in 2013, he was informed that he was no longer needed on the big Nissan account that he had worked on in Arizona and Tennessee, so he found out about another job within C.B.R.E. in Illinois. Because Mother's family was from Illinois, this was a desirable location for them. Stepfather and

7

Mother's other son moved up to Illinois, but Father blocked Mother and Kloe from moving at the same time. This was upsetting to Kloe. She was not in Illinois at the start of the school year.

At the time of the hearing, Kloe was nine years old, just about to turn ten. Mother testified that Kloe was "pretty much a straight-A student. She loves to read, she's always done really well, exceptionally well, in school." She had qualified as "gifted" in the past. Mother stated that she and Stepfather were financially able to provide for Kloe's necessities and that she had been the child's primary residential parent for her whole life. She testified that she had a "really good" relationship with Kloe and that they liked to do things together like go to the movies, go shopping, or just play in the snow. She and Kloe both liked to go to the library and sometimes rode bikes together. Kloe also got along well with Stepfather; they liked to be corny and silly sometimes. Mother described Kloe as easygoing and lighthearted; she was not a difficult child to get along with, but was respectful and well-behaved. She loved animals. Keenan, Kloe's brother, and Kloe got along as normal siblings, arguing at times and getting jealous at times, but generally supporting one another and loving each other.

As to how the current parenting plan was working, Mother testified that Father had not exercised all three of his weekend visits in Tennessee. She stated that five weeks was the longest continuous period of time that Kloe had spent with Father, which had occurred the previous summer. Mother testified that she did not monitor Kloe's phone calls with her father or interfere with them in any way.

Mother stated that she believed Kloe loved her father and that Mother wanted Kloe to have a good relationship with him. She went on to say, though, that she was concerned about what Kloe told her about derogatory comments made by Father and Stepmother and about what happened with her clothing at Father's house. Mother would get frustrated "because I can't work with [Father] on the level that I think co-parents should. . . . I feel like our communication has broken down so much in these past few years in the litigation." According to Mother, Kloe became anxious before she went to visit Father: "I know it's because she's excited but, at the same time, she's nervous because she's worried about some of the things they say about me when she's there." Mother listed her concerns: Father and Stepmother not allowing Kloe to bring her clothes into their house, not allowing her to call Mother when she cries, sending emails to Mother telling her not to call Kloe because it upsets her, and Kloe telling Mother she gets "scared" and that she is not able to call Mother.

Asked whether the parenting plan should be modified, Mother stated that four weeks at a time was too long and should be split up; otherwise, she thought the weekend visits should be designated more clearly. Mother also wanted payment for the flights to

be clearer. Mother further expressed her concerns with having the child change planes on her own.

Mother testified that she took Kloe to Ms. Steyer because she felt the child was experiencing stress from being "in the middle of it" due to the litigation between the parents. She stated that she tried to heed Ms. Steyer's advice and "not to communicate in a negative manner or get engaged in arguments." As to the photo albums, Mother testified that she asked Father to stop sending the albums to her house with Kloe. She understood that she had "acted poorly." She explained that a couple of the pictures in the wedding album "actually had Kloe and Jennifer, her step-mother, in there that said 'Mommy's Girl,' and it just really upset me." Stepfather wrote a letter to Father and sent the album back to Father with the letter. Mother acknowledged that she had not handled the situation appropriately.

Since the summer of 2013, Mother believed that she was "trying not to get caught up in – or engaging in constant bickering and fighting via email. We don't converse on the phone." She went on to state that she was trying not to get involved with Kloe's relationship with Father: "I'm really trying to step back and not get involved or make her feel like she's being pulled between the two of us." She told Kloe that her father loved her and that she needed to listen to Father and Stepmother when she was with them.

Asked about Father's two proposed parenting plans, Mother opined that it would not be in Kloe's best interest to alternate school years between the parents. She felt this would be difficult for the child. Further, she did not agree that Kloe should live with Father.

On cross-examination, Mother acknowledged sending Father derogatory emails in the past telling him that he was not a good father. Mother again explained that she had reformed her behavior and now realized the importance of fostering a healthy relationship between Kloe and Father.

The final witness was John Myers, Stepfather, who testified that he had known Kloe since around March 2006. He opined that Mother was a caring and involved mother who always had her children's interests at heart. He stated that Kloe and Mother got along "great" and that Kloe was a happy child. She was bright and excelled in school. As to his relationship with Kloe, Stepfather testified that it was positive.

Stepfather stated that he worked for C.B.R.E., a commercial real estate company; his current position was facilities manager. The previous summer, when he lived in Franklin, Tennessee, he worked on the Nissan account, but his position on that account was terminated because the client did not feel that he was a good fit for that account.

Stepfather testified about the photo albums and about how upset Kloe and Mother were about them. He explained that he had not destroyed the other album. It was returned to Father at the hearing.

*Trial court's decision*

The trial court filed an order on August 18, 2014 in which it found that there had been a material change in circumstances. The facts supporting this finding were: (1) the two fairly quick moves, which were not "simply across the state line," but were a "significant ways away"; (2) the increasing tension between the parties, with some adjustment on Mother's part and a bit of de-escalation; and (3) Mother's failure to follow the orders of the Arizona court and to engage in "the type of co-parenting that most courts would appreciate," as well as the unworkable nature of the current parenting plan.

Having found a material change in circumstances, the trial court proceeded to consider the best interest factors contained in Tenn. Code Ann. § 36-6-106(a). (The court's analysis will be examined in detail below.) The court concluded that it was not in Kloe's best interest to change her primary residential parent. Pursuant to the parenting plan ordered by the trial court, Father had 80 days of parenting time a year (an increase over the former parenting plan under which he had approximately 67 days a year[3]). He had five weeks of parenting time during the summer, spread out over three visits—two two-week visits and one one-week visit.

Mother filed a motion to alter or amend the trial court's order and/or a motion to modify child support. She sought a subpoena requiring Father to provide proof of his actual income, an update of her income, the addition of the Los Angeles airport as an optional airport, and the addition of the cost of her health insurance to the child support worksheet. In his response, Father admitted that his income had increased post-trial.

On October 6, 2014, the trial court entered an agreed order modifying Father's child support obligation to $839.00 a month. Father appealed the trial court's August 18, 2014 decision.

ISSUES ON APPEAL

Father argues that the trial court erred in allowing the therapist, Ms. Steyer, to testify regarding hearsay statements of the minor child and in admitting the therapist's expert opinion testimony. Father further argues that the trial court erred in failing to

_____

[3] This is according to Father's estimate at the hearing.

make him the primary residential parent or to maximize the parenting time for both parents. Mother asserts that the trial court erred in failing to award her attorney fees and costs; she also seeks her attorney fees and costs on appeal.

ANALYSIS

Testimony of therapist

Father first argues that the trial court erred in failing to grant his motion in limine to exclude the expert opinion testimony of the therapist, Ms. Steyer. He asserts three errors: that the trial court should not have allowed the therapist to testify as an expert; that the trial court should have prohibited the therapist from being a conduit for the child's testimony; and that the communications between the child and the therapist were privileged communications.

Questions regarding the admissibility of expert testimony "are matters left to the trial court's discretion." *Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 273 (Tenn. 2005). Under the deferential abuse of discretion standard, we must review a trial court's discretionary decision to determine:

> (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the [trial] court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the [trial] court's decision was within the range of acceptable alternative dispositions.

*Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524-525 (Tenn. 2010); *see also Flautt & Mann v. Council of Memphis*, 285 S.W.3d 856, 872-73 (Tenn. Ct. App. 2008) (quoting *BIF, a Div. of Gen. Signal Controls, Inc. v. Serv. Constr. Co.*, No. 87-136-II, 1988 WL 72409, at *3 (Tenn. Ct. App. July 13, 1988).

Although Father asserts that the trial court erred in allowing Ms. Steyer to testify as an expert, he does not directly challenge her qualifications.[4] Tennessee Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will *substantially*

---

[4] Father focuses on the content of Ms. Steyer's testimony, asserting that she relies on hearsay from the child, and challenging her diagnosis of loyalty strain as not widely accepted in the professional community. These arguments will be addressed below with respect to the hearsay argument.

11

> *assist the trier of fact* to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

(Emphasis added). On voir dire, Ms. Steyer testified that she is a licensed marriage and family therapist with a master's degree in marriage and family therapy. She had previous experience testifying as an expert in custody cases. The trial court stated that it "would have no questions with regard to whether . . . she's able to . . . significantly assist the trier of fact . . . ." Thus, the court was "satisfied with her qualifications as an expert in the field." Father has provided no evidence to suggest that the trial court abused its discretion in accepting Ms. Steyer as an expert. Moreover, contrary to Father's assertion, Ms. Steyer did provide a diagnosis under the DSM during her testimony.

We next address Father's assertion that the trial court erred in allowing Ms. Steyer to testify to hearsay statements. There is no dispute that Ms. Steyer's testimony includes some statements made by Kloe. The therapist relied on statements made by the child to bolster her opinions and to support her diagnoses. For example, Ms. Steyer testified that Kloe felt that she had to choose between her parents and that it was not okay for her to speak of loving one parent in front of the other or, in particular, to speak of missing her mother in front of her father. These statements supported Ms. Steyer's diagnosis of loyalty strain. According to Ms. Steyer, Kloe also told her that Father asked her where she preferred to live and that, when the child said she wanted things to stay the same, Father cried.

Father argues that, "The Court should have prevented the therapist from being a conduit for the statements of the child that did not fall under the narrow exception found in the rules of evidence." The "narrow exception" referenced by Father is the hearsay exception for abuse and neglect set forth in Tenn. R. Evid. 803(25). Because this case does not involve allegations of abuse and neglect, however, subsection (25) is not applicable. Mother argues that other subsections of Tenn. R. Evid. 803 are applicable to the hearsay statements of Kloe included in Ms. Steyer's testimony. For example, she points to Tenn. R. Evid. 803(4) regarding statements made for the purpose of medical diagnosis or treatment.[5] We have concluded, as did the trial court, that Tenn. R. Evid.

---

[5] In *State v. Gordon*, 952 S.W.2d 817, 823 (Tenn. 1997), our Supreme Court held that the statements of a child (who was allegedly raped) to a psychologist were made for the purposes of medical diagnosis and treatment within the meaning of Tenn. R. Evid. 803(4). The child, in *Gordon*, was taken to the hospital immediately after the incident, then taken to the emergency room where she spent several hours. *Id.* The next day, she was interviewed by a child psychologist at Our Kids Clinic; the history taken by the psychologist was relied upon by the nurse practitioner who treated the child. *Id.* In each case, it must be determined, based upon all of the surrounding circumstances, whether a particular statement is "reasonably pertinent to diagnosis and treatment." Tenn. R. Evid. 803(4); *Gordon*, 952

702 and 703 are dispositive on the issue before this court.

Tennessee Rule of Evidence 703 provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. *If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.* Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

(Emphasis added).

Our Supreme Court explained the proper application of these rules in *McDaniel v. CSX Transportation, Inc.*, 955 S.W.2d 257 (Tenn. 1997):

In Tennessee, under [Tenn. R. Evid. 702 and 703], a trial court must determine whether the evidence will substantially assist the trier of fact to determine a fact in issue and whether the facts and data underlying the evidence indicate a lack of trustworthiness. The rules together necessarily require a determination as to the scientific validity or reliability of the evidence.[6]

*McDaniel*, 955 S.W.2d at 265. When determining whether expert testimony meets the requirements of Rules 702 and 703, a trial court must consider whether the "'basis for the witness's opinion, *i.e.*, testing, research, studies, or experience-based observations,

---

S.W.2d at 823.

[6] The Court, in *McDaniel*, also established nonexclusive reliability factors often relied upon by courts in assessing scientific testimony:

(1) Whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether . . . the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of the litigation.

*McDaniel*, 955 S.W.3d at 265. Other cases have recognized, however, that these factors do not fit in every case. *See Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 272 (Tenn. 2005).

adequately supports that expert's conclusions' to ensure that there is not a significant analytical gap between the expert's opinion and the data upon which the opinion is based." *Denning v. CSX Transp., Inc.*, M2012-01077-COA-R3-CV, 2013 WL 5569145, at *5 (Tenn. Ct. App. Oct. 9, 2013) (quoting *State v. Scott*, 275 S.W.3d 395, 402 (Tenn. 2009)).

In *Brown v. Crown Equipment Corporation*, our Supreme Court reversed the trial court's decision to exclude the expert testimony of a mechanical engineer and a biomechanical engineer in a products liability action. *Brown*, 181 S.W.3d at 272. The Court discussed factors that a trial court may consider to determine the reliability of an expert's methodology—including the "expert's qualifications for testifying on the subject at issue[,] . . . particularly where the expert's personal experience is essential to the methodology or analysis underlying his or her opinion." *Id.* at 274 (citation omitted). Another factor the Court discussed was "the connection between the expert's knowledge and the basis for the expert's opinion." *Id.* at 275 (citation omitted). The latter factor was described as being "important particularly when the expert's opinions are based upon experience or observations as these areas are not easily verifiable." *Id.* (citation omitted).

The Court, in *Brown*, emphasized that these factors are non-exclusive and that a trial court is not required to consider them in making a determination regarding the reliability of an expert's testimony. *Id.* The Court continued:

> [T]he trial court enjoys the same latitude in determining how to test the reliability of an expert as the trial court possesses in deciding whether the expert's relevant testimony is reliable. [*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)]. The objective of the trial court's gatekeeping function is to ensure that "an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* Furthermore, upon admission, expert testimony will be subject to vigorous cross-examination and countervailing proof. [*State v. Stevens*, 78 S.W.3d 817, 835 (Tenn. 2002)]; *McDaniel*, 955 S.W.2d at 265. The weight of the theories and the resolution of legitimate but competing expert opinions are matters entrusted to the trier of fact. *See McDaniel*, 955 S.W.2d at 265.

*Id.*

With regard to Father's hearsay argument, Tenn. R. Evid. 703 expressly states: "If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

This language has been interpreted to allow hearsay to support an expert opinion. *See Holder v. Westgate Resorts Ltd.*, 356 S.W.3d 373, 379 (Tenn. 2011); *State v. Lewis*, 235 S.W.3d 136, 151 (Tenn. 2007). Therapists rely on the hearsay statements of their clients to form opinions regarding a diagnosis. Because the hearsay statements at issue were used to bolster Ms. Steyer's diagnosis, we find no abuse of discretion in the trial court's decision to allow Ms. Steyer to testify as an expert and to admit the statements of Kloe about which she testified.[7]

We also reject the third prong of Father's argument with respect to Ms. Steyer's testimony: that Kloe's statements to Ms. Steyer constituted privileged communications. Father relies upon Tenn. Code Ann. § 63-22-114, which provides, in pertinent part:

> The confidential relations and communications between licensed marital and family therapists, licensed professional counselors or certified clinical pastoral therapists and clients are placed upon the same basis as those provided by law between attorney and client, and nothing in this part shall be construed to require any such privileged communication to be disclosed.

Thus, the law recognizes a confidential relationship between a marital and family therapist and his or her client. In *Shaw v. Shaw*, No. E2010-01070-COA-R10-CV, 2011 WL 255335, at *4-5 (Tenn. Ct. App. Jan. 20, 2011) a case involving a father's request for access to his daughter's counseling records, the court stated:

> We conclude that a child's perceived loss of a confidential relationship with a therapist, standing alone, is insufficient to make the furnishing of such records to a parent, including a noncustodial parent, against a child's best interest.
> . . .
> [W]hile these records certainly are privileged, that privilege can be waived by either parent, unless to do so would not be in the child's best interest. In the absence of a finding of abuse, a finding that it is in the child's best interest not to disclose the records to a non-custodial parent will be a

---

[7] This Court is aware of cases decided under Tenn. R. Evid. 703 involving psychologists testifying as experts with respect to scientific theories. *See, e.g., State v. Shuck*, 953 S.W.2d 662, 667 (Tenn. 1997) (finding testimony regarding defendant's susceptibility to inducement admissible). We are not, however, aware of caselaw decided under Tenn. R. Evid. 703 involving a child's statements to a therapist or psychologist. Rather, the cases about children's statements to therapists have been decided under Tenn. R. Evid. 803(25) regarding "statements about abuse or neglect made by a child alleged to be the victim of physical, sexual, or psychological abuse or neglect." *See, e.g., In re Malichi C.*, No. E2009-00055-COA-R3-PT, 2009 WL 3270178, at *10 (Tenn. Ct. App. Oct. 13, 2009); *State Dep't of Children's Servs. v. M.S.*, No. M2003-01670-COA-R3-CV, 2005 WL 549141, at *17 (Tenn. Ct. App. Mar. 8, 2005).

difficult hurdle to overcome.

In this case, Kloe is a ten-year-old, so her confidential relationship with Ms. Steyer was subject to waiver by either of her parents, unless the trial court determined that allowing such waiver would be contrary to her best interest. The trial court rejected Father's privilege argument, stating that perhaps if Kloe were an older child, 16 or 17, the Court would have taken the argument more seriously.

We find no abuse of discretion in the trial court's rulings with regard to the testimony of Ms. Steyer.

<u>Primary residential parent</u>

Father's other argument is that the trial court erred in failing to make him the child's primary residential parent or, in the alternative, to maximize his parenting time as required by Tenn. Code Ann. § 36-6-106(a).

We review the trial court's findings of fact de novo, presuming them to be correct unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d); *Mann v. Mann*, 299 S.W.3d 69, 71 (Tenn. Ct. App. 2009); *Smith v. Tenn. Farmers Life Reassurance Co.*, 210 S.W.3d 584, 588 (Tenn. Ct. App. 2006). "[F]or the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect." *Nashville Ford Tractor, Inc. v. Great Am. Ins. Co.*, 194 S.W.3d 415, 425 (Tenn. Ct. App. 2005). Appellate courts give "great weight" to a trial court's findings of fact that are based on a witness's credibility. *Mann*, 299 S.W.3d at 71; *Smith*, 210 S.W.3d at 588. We review questions of law de novo with no presumption of correctness. *Nelson v. Wal-Mart Stores, Inc.*, 8 S.W.3d 625, 628 (Tenn. 1999).

With respect to a petition to modify a permanent parenting plan to change the primary residential parent, the threshold issue is whether there has been a material change of circumstances since the plan took effect. *See* Tenn. Code Ann. § 36-6-101(a)(2)(B); *Cranston v. Combs*, 106 S.W.3d 641, 644 (Tenn. 2003). In this context, a material change of circumstance "may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child." Tenn. Code Ann. § 36-6-101(a)(2)(B). If the trial court finds that there has been a material change in circumstances, it must then determine whether it is in the child's best interest to modify the parenting plan as requested. *See* Tenn. Code Ann. § 36-6-106(a); *Cranston*, 106 S.W.3d at 644.

A trial court's determinations as to "whether a material change in circumstances

16

has occurred and whether modification of a parenting plan serves a child's best interests are factual questions." *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013). "Because decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors, trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges."*Id.* at 693 (citations omitted). Thus, "[a] trial court's decision regarding the details of a residential parenting schedule should not be reversed absent an abuse of discretion." *Id.* (citation omitted).

The trial court found that there had been a material change of circumstances in this case:

1. There has been a material change in circumstances. There have been 2 fairly quick moves. The moves, in and of themselves, would cause the Court some concern and should cause the father some concern. The moves weren't simply across the state line. They were significant ways away.
2. The Court is concerned that the tension between the parties has continued to increase. There has been a slight adjustment on Mother's part. There has been a bit of de-escalation of the tensions, yet those tensions still exist.
3. Mother did clearly not follow court orders out of Arizona. She has not engaged in the type of co-parenting that most courts would appreciate. Additionally, the current parenting plan is unworkable.

Father is not arguing that the court erred on the issue of a material change of circumstances.[8]

The second step in the analysis regarding whether there should be a change in the primary residential parent is to determine whether such a change would be in the best interest of the child. Tennessee Code Annotated 36-6-106(a) sets out factors to be considered by the court in determining the best interest of the child. The court made findings of fact with respect to all of the statutory factors:

5. As to Factor Number 1 (the love, affection, and emotional ties existing between the parents of the child), the Court believes that both parents love the child. There has been nothing to show this Court that the emotional ties existing between the parents and the child are anything but strong. If the Court were to guess, it would surmise the emotional

---

[8] Mother does not assert that the court erred in finding a material change in circumstances.

ties between the child and Mother are stronger, simply because of the amount of time Mother gets to enjoy with the child. However, Number 1 is a wash and should be fairly given to each party.

6. As to Factor Number 2 (the disposition of the parties to provide the children with basic needs), Father has put forward quite a bit of argument and some evidence that Mother, without being married, would have a difficult time providing for the child. That may be true to some degree but the Court does not believe there is any concern that both parents aren't able to provide, clearly, for the basic needs of the child. Factor Number 2 is a wash and should be equally given to both parties.

7. As to Factor Number 3 (the importance of continuity in the child's life), the Court puts great weight on the fact Mother has been the primary caregiver. This factor was a major issue of dispute. Mother has moved from state to state. Father has moved quite a bit, which would cause the Court concern that he would continue to move residences, even though it has been within the same state and even, at times, within the same street. It appears the child seems to be very well-adjusted, even though the living location of the child has not been what the Court would consider to be stable. The environment and homes provided seem to have been quite stable. The Mother should probably be given a little weight on Category Number 3.

8. As to Factor Number 4 (the stability of the family unit of the parents or caregivers), the Court finds there hasn't been a lot of testimony with regard to this factor. Father has a sister who lives close and Mother has her family in Illinois. There is no reason to believe that both parties do not have family support. Mother has been able to obtain quite a bit more family support by her more recent move.

9. As to Factor Number 5 (the mental and physical health of the parents), the Court believes both parents are mentally and physically healthy.

10. As to Factor Number 6 (the home, school, and community record of the child), the school record of the child is important. The child appears to be well-adjusted at school and has a good school record. The Court did not put any weight on the fact that the moves have occurred and her school has been disrupted.

11. As to Factor Number 7 (the reasonable preference of the child), the preference of the child was not considered.

12. As to Factor Number 8 (evidence of physical or emotional abuse), there is no evidence of any physical or emotional abuse to the child.

13. As to Factor Number 9 (the character and behavior of any person who resides in or frequents the home of a parent and the person's interactions with the child), the Court has no reason to believe any person who

18

resides in or frequents the home of the child is a bad influence on the child. Additionally, the Court has a vested interest in attempting to keep siblings together. The Court placed weight on whether it would be appropriate to separate those children.[9]

14. As to Factor Number 10 (each parent or caregiver's potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate a close parent/child relationship with the other), the Court finds both parents have failed at that. Both parents have attempted to move on but in doing so have created an environment for the child to believe that the other parent is not as important. The primary responsibility of this rests on Mother's shoulders and places quite a bit of responsibility for that on her.

After having considered all of these factors, the trial court reached the following conclusions:

[T]he child is well-adjusted and in a stable home, if not a stable home location. The Court does not believe that Mother's efforts have gone so far as to undermine Father's abilities to maintain a good relationship and bond with the child. *For the Court to uproot the child and switch the parenting plan, the Court would have to find fairly compelling evidence that Mother's intentions were to alienate Father and that those intentions were having an effect that the child was being damaged*. The Court is not able to do that. The Court is not close to the level where it would consider changing an agreement or a previous court order that has been in place for some time.

(Emphasis added). The trial court made some modifications to the parenting plan, including changing Father's summer parenting time to three separate periods (June 1 to June 15, July 1 to July 15, August 1 to August 7) instead of one four-week period; and specifying dates for weekend parenting time.

Father's arguments against the trial court's failure to make him the primary residential parent all focus on factor ten—each parent's ability to facilitate a close parent/child relationship between the child and the other parent. *See* Tenn. Code Ann. § 36-6-106(a)(10). He asserts:

Mother's insistence on using the LAX airport, her refusal to allow the Father video conferencing time (Skype), her tossing the child's photo album, her ignoring the father's calls to the child, her foul name-calling

---

[9] Kloe and her half-brother Keenan have grown up together with Mother.

emails, and her attempts to change the child's name and call the stepfather 'daddy' all point to her attempts to annihilate the existence of the Father in the life of the child.

Father argues that the evidence preponderates against the trial court's finding that both parents had failed to foster the child's relationship with the other parent. He asserts that the "evidence was overwhelming that the Mother had intentionally undermined the Father to the child."

We begin our analysis by noting that the trial court made an erroneous statement as to the proper standard to apply in considering the child's best interest: "For the Court to uproot the child and switch the parenting plan, the Court would have to find *fairly compelling evidence* that Mother's intentions were to alienate Father and that those intentions were having an effect that the child was being damaged." (Emphasis added). Rather, pursuant to Tenn. Code Ann. § 36-6-101(a)(2)(B), "If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a *preponderance of the evidence* a material change in circumstance." (Emphasis added). That subsection goes on to state that, "A material change of circumstance does not require a showing of a substantial risk of harm to the child." Tenn. Code Ann. § 36-6-101(a)(2)(B). Thus, the appropriate standard is the preponderance of the evidence.

In her proof, Mother presented a different version of the facts, describing actions by Father designed to put distance between Kloe and Mother. For example, Mother asserts that Father and his wife made derogatory comments about Mother in Kloe's presence; that Father questioned Kloe about her desires regarding custody and cried when she said she wanted to continue living primarily with Mother; that Father would not let Kloe call Mother when she was at his house; and that Father required Kloe to leave her suitcase in the garage and criticized the clothing she brought. Mother testified that she wanted Kloe to have a good relationship with her father.

In making its determination regarding the primary residential parent issue, the trial court necessarily relied upon its assessment of the parties' credibility. Appellate courts give "great weight" to a trial court's findings of fact that are based on a witness's credibility. *Smith*, 210 S.W.3d at 588.

Father proposed two parenting plans. In one, he would be the primary residential parent. We cannot say that the evidence preponderates against the trial court's decision to keep Mother as the primary residential parent. In the second, Father and Mother would have primary residential parenting responsibilities in alternating years. We likewise cannot say that the evidence preponderates against the trial court's decision to

20

reject this option.[10]  Although the trial court stated an erroneous standard, we find that the evidence does not preponderate against the trial court's ultimate decision.

Attorney fees

Mother argues that the trial court erred in failing to award her attorney fees and costs and that she should be awarded attorney fees and costs on appeal.

Tennessee abides by the American Rule regarding the payment of attorney fees. *State v. Brown & Williamson Tobacco Corp.*, 18 S.W.3d 186, 194 (Tenn. 2000). The rule requires litigants to pay their own attorney fees unless a statute or an agreement provides otherwise. *Id.*   There is such a statute applicable in cases involving "custody or the change of custody." Tenn. Code Ann. § 36-5-103(c).  Tennessee Code Annotated section 36-6-103(c) provides:

> The plaintiff spouse may recover from the defendant spouse, and the spouse or other person to whom the custody of the child, or children, is awarded may recover from the other spouse reasonable attorney fees incurred in enforcing any decree for alimony and/or child support, or in regard to any suit or action concerning the adjudication of the custody or the change of custody of any child, or children, of the parties, both upon the original divorce hearing and at any subsequent hearing, which fees may be fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of such court.

An award of attorney's fees is "largely in the discretion of the trial court, and the appellate court will not interfere except upon a clear showing of abuse of that discretion." *Aaron v. Aaron*, 909 S.W.2d 408, 411 (Tenn. 1995) (citation omitted). A trial court abuses its discretion when it applies an incorrect legal standard, reaches a result that is not logical, decides a case based on an assessment of the evidence that is clearly erroneous, or relies on reasoning that results in an injustice to an interested party. *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011).

The court in this case decided that each party would be responsible for his or her own attorney fees.  Mother cites a statement by the court that the evidence was not close to justifying a change in custody.  The court also noted, however, that:

---

[10] Father has not proposed any other method of maximizing his parenting time under the existing limitations—*i.e*., he lives in California and Mother lives in Illinois.

Both parents have attempted to move on but in doing so have created an environment for the child to believe that the other parent is not as important. *The primary responsibility of this rests on Mother's shoulders and places quite a bit of responsibility for that on her.*

(Emphasis added). We find that the trial court's decision not to award Mother her attorney fees is "within the range of acceptable alternatives." *BIF*, 1988 WL 72409, at *3. We find no abuse of discretion.

We further decline to award Mother her attorney fees on appeal.

CONCLUSION

The judgment of the trial court is affirmed. Costs of appeal are assessed against the appellant, Michael Watson, and execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE

22